# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

## Number: 24-30315

_____

### UNITED STATES OF AMERICA,
                              Plaintiff – Appellee

versus

### SHIVA AKULA,
                              Defendant – Appellant

_____

ORIGINAL BRIEF FOR THE APPELLANT
**SHIVA AKULA**


CRIMINAL APPEAL FROM THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA (NEW ORLEANS)
NUMBER: 2:21-cr-98-1


**MARK DAVID PLAISANCE, 23259**
PLAISANCE LAW LLC
P.O. Box 1123
Prairieville, LA
(225) 775-5297
mark@plaisancelaw.com
CJA Appellate Counsel

**UNITED STATES OF AMERICA,**

Plaintiff – Appellee

versus

**SHIVA AKULA**,

Defendant – Appellant

_____

## CERTIFICATE OF INTERESTED PERSONS
_____

Counsel of record certifies that the following listed persons and entities

as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest

in the outcome of this case. These representations are made in order that the

judges of this court may evaluate possible disqualification or recusal.

**Appellant**

Shiva Akula (#61778-509)
FCI Memphis
Federal Correctional Institution
P.O. Box 34550
Memphis, TN 38184

**Attorneys for Appellant**

Claude J. Kelly                          David M. DeVillers
500 Poydras Street, Rm. 318              41 S. High Street, Ste. 3300
New Orleans, LA 70130                    Columbus, OH 43215
(Trial Attorney)                         (Trial Attorney)

Julie Tizzard
700 Camp St., Ste. 101
New Orleans, LA 70130
(Trial Attorney)

Rachel Conner
3015 Magazine Street
New Orleans, LA 70115
(Trial Attorney)

Stephen Shapiro
700 Camp St.
New Orleans, LA 70130
(Trial Attorney)

Bernard Cassidy
200 S. Andrews Ave., Ste. 900
Fort Lauderdale, FL 33301
(Trial Attorney)

Niles Illich
15455 Dallas Pkwy., Ste. 540
Addison, TX 75001
(Trial Attorney)

Townsend Myers
4907 Magazine St.
New Orleans, LA 70115
(Trial Attorney)

Morris Reed
4919 Canal St.
New Orleans, LA 70119
(Trial Attorney)

Robert Toale
505 Weyer Street
Gretna, LA 70053
(Trial Attorney)

Valerie Jusselin
500 Poydras St., Rm 318
New Orleans, LA 70130
(Trial Attorney)

Brady Wyatt
3300 Oak Lawn, Ste. 600
Dallas, TX 75219
(Trial Attorney)

Robert Malove
200 SE 9th Street
Ft. Lauderdale, FL 33316
(Trial Attorney)

Mark David Plaisance
P.O. Box 1123
Prairieville, LA 70769
(Appellate Attorney)

**Appellee**

United States of America

**Attorneys for Appellee**

Kathryn McHugh
Churita Hansell
Jeffrey McLaren
650 Poydras St., Ste. 1600
New Orleans, LA 70130
(Trial Counsel)

Kevin G. Boitmann
650 Poydras St., Ste. 1600
New Orleans, LA 70130
(Appellate Counsel)

Prairieville, Louisiana, this 1st day of July 2025.

/s/ Mark David Plaisance

**MARK DAVID PLAISANCE**

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument may assist the court in this Medicare fraud appeal. The defendant's right to present a defense was thwarted when the trial court refused to qualify Dr. Greg Davis as an expert in medical coding on grounds the witness lacked detailed expertise and merely because Dr. Davis lacked a piece of paper (certificate). This issue underlies the constitutional deprivation of right to present a defense, given the government's ability to present expert testimony on the same issue and the court providing the jury the government expert's report during deliberations.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS.............................................................i

STATEMENT REGARDING ORAL ARGUMENT................................................iv

TABLE OF CONTENTS.........................................................................................v

TABLE OF AUTHORITIES.................................................................................vii

STATEMENT OF JURISDICTION.......................................................................1

ISSUES PRESENTED FOR REVIEW....................................................................1

STATEMENT OF THE CASE................................................................................3

SUMMARY OF THE ARGUMENT.....................................................................19

ARGUMENT........................................................................................................21

     1.     The trial court erred by not qualifying Dr. Greg Davis as an expert.......................................................................................22

           A.     Whether Dr. Davis had previously qualified as an expert is irrelevant to his qualification to testify as a medical coding expert witness for Dr. Akula...............................................................29

           B.     The trial court unduly focused on Dr. Davis's lack of a coding certificate...................................30

C.    Dr. Davis has the knowledge, skill, and experience to educate the jury about medical coding..................................................................34

2.    The government failed to demonstrate Dr. Akula knowingly or willfully acted with knowledge to commit health care fraud..........................................................................43

A.    The evidence in insufficient to prove Dr. Akula committed health care fraud...............................46

B.    Dr. Akula's defense further exposes the lack of *mens rea* evidence to support a conviction for health care fraud...................................................56

3.    The upward variance results in an unconstitutionally excessive sentence......................................................................65

CONCLUSION & RELIEF SOUGHT.........................................................................68

CERTIFICATE OF SERVICE.....................................................................................70

CERTIFICATE OF COMPLIANCE.............................................................................71

# TABLE OF AUTHORITIES

## CASES

*Berman v. United States*, 302 U.S. 211, 58 S.Ct. 164, 82 L.Ed.2d 204 (1937)...........1

*Bryan v. United States*, 524 U.S. 184, 191-92, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998)....................................................................................................................61

*Catapult Communications Corp. v. Foster*, 2010 WL 659072 (N.D. Ill. 2010), *objections denied*, 2010 WL 3951973 (N.D. Ill. 2010)................................................29

*Cedar Lodge Plantation, L.L.C. v. CSHV Fairway View I, L.L.C.*, 753 F. Appx 191 (5th Cir. 2018)........................................................................................................33

*Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).......39

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)................................................................................................26

*Davis v. United States*, 2011 WL 7053628 (S.D. W. Va. 2011)................................32

*DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679 (5th Cir. 2003)..............................42

*Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007).............66

*Garrison v. United States*, 163 F.2d 874 (5th Cir. 1947)...........................................46

*Guzman v. Mem'l Hermann Hosp. Sys.*, 2008 WL 5273713 (S.D. Tex. Dec. 17, 2008)....................................................................................................................27

*Hart v. Broomfield*, 97 F.4th 644 (9th Cir. 2024), *aff'd, certificate of appealability denied*, 2024 WL 13322715 (9th Cir. 2024), *cert. denied*, 145 S.Ct. 1334 (2025)....32

*Hewlett-Packard Co. v. EMC Corp.*, 330 F.Supp.2d 1087 (N.D.Cal. 2004)............41

*Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777 (3rd 1996).................................39

*Holmes v. South Carolina*, 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006)................................................................................................................................40

*Huss v. Gayden*, 571 F.3d 442 (5th Cir. 2009), *reh'g denied*, 585 F.3d 823 (5th Cir. 2009), *cert. denied*, 559 U.S. 1007, 130 S.Ct. 1892, 176 L.Ed.2d 365 (2010)...........................................................................................................22,27, 38, 39

*Huval v. Offshore Pipelines, Inc.*, 86 F.3d 454 (5th Cir. 1996).........................20, 37

*In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)...............45

*Kelly v. Boeing Petroleum Servs., Inc.*, 61 F.3d 350 (5th Cir. 1995).........................42

*Kozak v. Medtronic, Inc.*, 512 F.Supp.2d 913 (S.D. Tex. 2007)...............................**27**

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)................................................................................................................................28

*Mathis v. Exxon Corp.*, 302 F.3d 448 (5th Cir. 2002), *reh'g denied*, 48 Fed.Appx. 919 (*en banc*)...................................................................................................................28

*Mike Hooks Dredging Co. v. Marquette Transp. Gulf-Inland, LLC*, 716 F.3d 886 (5th Cir. 2013)..................................................................................................20, 36

*Natchez Reg'l Med. Ctr. v. Quorum Health Res., LLC*, 879 F. Supp.2d 556 (S.D. Miss. 2012)......................................................................................32

*Perez v. Boecken*, 2020 WL 3074420 (W.D. Tex. 2020).............................................34

*Puga v. RCX Solutions, Incorporated*, 922 F.3d 285 (5th Cir. 2019).................23, 28

*Ratzlaf v. United States*, 510 U.S. 135, 137, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994)...............................................................................................61

*State v. Schlessinger*, 525 So.2d 50 (La. App. 2 Cir. 1988)......................................33

*State v. Smith,* 448 So.2d 778 (La. App. 2 Cir. 1984)...............................................30

*Tanner v. Westbrook*, 174 F.3d 542 (5th Cir. 1999), *reh'g denied*, 192 F.3d 128 (5th Cir. 1999)(*en banc*).........................................................................19, 27

*United States v. Allison*, 616 F.2d 779 (5th Cir. 1980), *cert. denied*, 449 U.S. 857, 101 S.Ct. 156, 66 L.Ed.2d 72........................................................................65

*United States ex rel. Armfield v. Gills*, 2012 WL 12918276 (M.D. Fla. 2012)..............................................................................................37, 38

*United States v. Barnes*, 979 F.3d 283 (5th Cir. 2020), *cert. denied*, 142 S.Ct. 94 (2021)...............................................................................................63

*United States v. Bostic*, 970 F.3d 607 (5th Cir. 2020)...............................................66

*United States v. Brooks*, 681 F.3d 678, 699 (5th Cir.2012), *cert. denied*, 568 U.S. 1085, 133 S.Ct. 836, 133 S.Ct. 837, and 133 S.Ct. 839, 184 L.Ed.2d 652 (2013)...............................................................................................47

*United States v. Brown*, 871 F.3d 352 (5th Cir. 2017)................................21, 27, 36

*United States v. Caballero*, 2024 WL 3175453 (5th Cir. 2024)(not reported)........45

*United States v. Carbajal*, 290 F.3d 277 (5th Cir. 2002), *writ denied*, 537 U.S. 934, 123 S.Ct. 34, 154 L.Ed.2d 235 (2002)...........................................................46

*United States v. Colton*, 231 F.3d 890, 901 (4th Cir. 2000)......................................50

*United States v. Cooks*, 589 F.3d 173 (5th Cir. 2009), *cert. denied*, 559 U.S. 1024, 130 S.Ct. 1930, 176 L.Ed.2d 397 (2010).......................................................34

*United States v. Diaz*, 2008 WL 906725 (S.D. Fla. 2008).........................................27

*United States v. Elfenbein*, 708 F.Supp.3d 621 (D.C. Md. 2023), *on appeal*, 24-4048 (4th Cir. 2024).............................................................................................50

*United States v. Fitzharris*, 633 F.2d 416 (5th Cir. 1980), *cert. denied*, 451 U.S. 988, 101 S.Ct. 2325, 68 L.Ed.2d 847 (1981).......................................................44

*United States v. Foster*, 2024 WL 3991455 (5th Cir. 2024)(not reported)..............45

*United States v. Gandy*, 795 Fed.Appx. 225 (5th Cir. 2019)...................................43

*United States v. Garcia*, 432 Fed.Appx. 318 (5th Cir.2011)..............................47, 48

*United States v. Garcia*, 99 F.4th 253 (5th Cir. 2024)................................................44

*United States v. Girod*, 646 F.3d 304, 313 (5th Cir.2011).........................................47

*United States v. Hickman*, 331 F.3d 439 (5th Cir.2003)............................................47

*United States v. Ifediba.* 46 F.4th 1225 (11th Cir. 2022), *cert. denied*, 143 S.Ct. 2586, 216 L.Ed.2d 1194 (2023).....................................................................63

*United States v. Imo*, 739 F.3d 226 (5th Cir. 2014).....................................................47

*United States v. Ismoila*, 100 F.3d 380 (5th Cir.1996)...............................................47

*United States v. Locascio*, 6 F.3d 924 (2d Cir. 1993), *cert. denied*, 511 U.S. 1070, 114 S.Ct. 1646, 128 L.Ed.2d (1994)...............................................................29

*United States v. Malmquist*, 92 F.4th 555 (5th Cir. 2024).......................................42

*United States v. Martinez*, 2008 WL 819024 (E.D. Wash. 2008)(not reported) .................................................................................................................54, 55

*United States v. Martinez*, 921 F.3d 452 (5th Cir. 2019)........................................63

*United States v. Medina*, 485 F.3d 1291 (11th Cir. 2007), *reh'g denied* (2007)......64

*United States ex rel. Montcrieff v. Peripheral Vascular Associates, P.A.*, 507 F.Supp.3d 734, (W.D. Tex. 2020), *aff'd in part, rev'd in part and remanded*, 133 F.4th 395 (5th Cir. 2025)...........................................................................35

*United States v. Moreland*, 665 F.3d 137 (5th Cir. 2011)...................................44, 46

*United States v. Njoku*, 737 F.3d 55 (5th Cir. 2013), *cert. denied*, 572 U.S. 1127, 134 S.Ct. 2319, 189 L.Ed.2d 196 (2014)......................................................39

*United States v. Parra*, 402 F.3d 752 (7th Cir. 2005)...............................................29

*United States v. Percel*, 553 F.3d 903, 910 (5th Cir. 2008), *cert. denied*, 556 U.S. 1213, 129 S,Ct, 2065, 173 L.Ed. 1143 (2009)...........................................44

-xi-

*United States v. Pettigrew*, 77 F.3d 1500 (5th Cir. 1996)...........................................44

*United States v. Pratt*, 807 F.3d 641 (5th Cir. 2015)....................................................45

*United States v. Rao*, 123 F.4th 270 (5th Cir. 2024)....................................................62

*United States v. Resio-Trejo*, 45 F.3d 907 (5th Cir. 1995).........................................43

*United States v. Ricard*, 922 F.3d 639 (5th Cir. 2019)................................................62

*United States v. Rivera-Berrios*, 968 F.3d 130 (1st Cir. 2020)..................................67

*United States v. Smith*, 440 F.3d 704 (5th Cir. 2006).................................................66

*United States v. Sosa*, 777 F.3d 1279 (11th Cir. 2015)...............................................64

*United States v. St. John*, 625 Fed. App'x 661 (5th Cir. 2015), *cert. denied*, 577 U.S. 1109, 136 S.Ct. 911, 193 L.Ed.2d 802 (2016)..............................................................62

*United States v. Turner*, 674 F.3d 420 (5th Cir. 2012), *cert. denied*, 568 U.S. 898, 133 S.Ct. 302, 184 L.Ed.2d 178 (2012).......................................................................45

*United States v. Wen Chyu Liu*, 716 F.3d 159 (5th Cir. 2013), *cert. denied*, 571 U.S. 1167, 134 S.Ct. 1011, 187 L.Ed.2d 858 (2014)...........................................................42

*United States v. West*, 58 F.3d 133 (5th Cir. 1995).............................................30, 37

*United States v. Whitfield*, 485 Fed.Appx. 667 (5th Cir.2012)..............................47

*United States v. Willett*, 751 F.3d 335 (5th Cir. 2014)...............................................62

*United States v. Winkler*, 639 F.3d 692 (5th Cir. 2011)..............................................43

## FEDERAL RULES OF CRIMINAL PROCEDURE

F.R.Cr.P. Rule 29.................................................................................passim

F. R.Cr.P. Rule 33................................................................................passim

## FEDERAL RULE OF EVIDENCE

F.R.E. Rule 104(a)......................................................................................28

F.R.E. Rule 702.................................................................................passim

## UNITED STATES CODE

18 U.S.C. §1347................................................................................passim

18 U.S.C. §3742.........................................................................................1

28 U.S.C. §1291..........................................................................................1

## UNITED STATES CONSTITUTION

Sixth Amendment.....................................................................................39

Eighth Amendment...................................................................................67

## TREATISE

Blacks Law Dictionary (9th ed.)..............................................................48

## FEDERAL RULES OF APPELLATE PROCEDURE

Federal Rule of Appellate Procedure 27(d)(2)(A).................................................71

Federal Rule of Appellate Procedure 32(a)(5)....................................................71

Federal Rule of Appellate Procedure 32(a)(6)....................................................71

Federal Rule of Appellate Procedure 32(f)........................................................71

## FIFTH CIRCUIT RULES

Fifth Circuit Rule 28.2.1...............................................................................i

## STATEMENT OF JURISDICTION

Shiva Akula appeals the district court judgment memorializing the jury verdict finding him guilty of 23 counts of Health Care Fraud, 18 U.S.C. §1347. ROA.2624-2630, RE 5.. The district court imposed a total term sentence of 240 months (120 months as to Count 2 and Count 5, to be served consecutive to each other and 120 months as to Counts 1, 3, 4, and 6 through 23, to be served concurrent to each other and concurrently to Counts 2 and 5). ROA.4974, ROA.5009, RE 6.

Because sentence has been imposed, the judgment is final. *Berman v. United States*, 302 U.S. 211, 58 S.Ct. 164, 82 L.Ed.2d 204 (1937). And because Akula timely filed for an appeal, ROA.5030, this court has jurisdiction. 18 U.S.C. §3742 and 28 U.S.C. §1291.

## ISSUES PRESENTED FOR REVIEW

1.  The threshold inquiry is whether an expert possesses the requisite qualifications – by knowledge, skill, experience, training or education – to render opinion on a particular subject matter. Because Dr. Greg

Davis had years of experience in coding, taught coding, took coding classes, and passed the certification exam, the district court erred in not qualifying him as expert on grounds he lacked detailed expertise and a certificate.

2.    To convict a person of health care fraud, the government must prove a person knowingly and willingly engaged in a scheme designed to defraud a health care benefit program. Because the testimony of the government's witnesses – including its expert – merely shows Canon Hospice had erroneously, not fraudulent, billing, the trial court should have granted a judgment of acquittal. Having failed to do so, this court should reverse and vacate Dr. Akula's conviction.

3.    A sentence is unconstitutionally excessive when it usurps the evolving standards marking the progress of a maturing society, reflected in the sentencing guidelines. An upward variance of 52 months – above the guideline high range – does not measurably contribute to the retributive end of punishment but is merely excessive.

## STATEMENT OF THE CASE

Dr. Shiva Akula was charged in a 23- count superseding indictment that alleged health care fraud relating to care for hospice patients at facilities he owned. ROA.13258-13268, RE 3. After two years of motions and discovery, in November 2023, the matter proceeded to jury trial. Testimony by the government's witnesses showed mistaken billing and erroneous billing, not fraudulent billing. More, as testimony experts show, the person responsible for billing, Rayeshwar Biyyam (Raj), did not testify. The government did not explain his absence.

### Shauna Hall

When she testified, Hall was a Project Manager for Olarant, a government contractor hired to investigate fraud, waste, and abuse within the Medicare and Medicaid program. ROA.5594. She served as a liaison to law enforcement. ROA.5594. Olarant provided claims analyst, reviewing medical records and billing to determine whether a claim should be paid. ROA.5595.

Hall did not conduct a review of Canon Hospice billing. ROA.5603.

Rather, Hall explained the Medicare process regarding hospice care.

Hall testified Dr. Akula executed documents to enroll in the Medicare program. The documents – the latest of which was signed in 2014 – contained statements regarding false claims. ROA.5626, Government Exhibit 10.005, ROA.8253. Hall further explained the Code of Federal Regulations provides requirements physicians must perform. ROA.5631. Hall testified that hospice care is not curative treatment. Medicare provides for approximately six months treatment, ROA.5606, designed for palliation and management, to make the patient comfortable. ROA.5604.

On cross-examination, Hall admitted that Canon Hospice had been audited beforehand with several claims denied. ROA.5660.

No fraud was alleged nor found. ROA.5707.

### Dr. William Blalock

Dr. Blalock worked at Canon Hospice while employed with Ochsner Hospital. ROA. 5791. At some point, Dr. Blalock became medical director at Canon Hospice. ROA.5795. His primary responsibility lie in ensuring "... that

I could find consistent doctors who were willing to work and round on those patients every single day." ROA.5797.

Dr. Blalock was never involved with billing, did not know the billing codes, ROA.5914, never directed anyone regarding billing, and never told doctors to bill in a particular manner. ROA.5799.

Dr. Blalock did not see Akula make rounds on patients, write notes, or order procedures. ROA.5796. Much the same, Dr. Akula never instructed Dr. Blalock, against his own medical opinion, to admit a person to hospice that should not be in hospice. ROA.5912. Nor did Dr. Akula order Dr. Blalock to keep patients in General Inpatient level of care or to keep patients longer than medically necessary. ROA.5914. Futher, no doctors under Dr. Blalock kept patients longer the necessary. ROA.5931.

> The problem is it's not easy. The - - one of the major problems we would run into is, say, if the patient is in hospice, once they're in there, the inpatient, they - - the family may not have the means or the ability to take them home and they may not have the money for a nursing home, so getting them out becomes a major problem sometimes.

ROA.5932. So, while disengaging and getting patients home, which on occasion resulted in the release of hospice patients – ostensibly to reduce cost to Medicare – was quite difficult. ROA.5932:

### Ahsaki George-Scharpon

Nurse practitioner George-Scharpon worked for Canon Hospice on two separate occasions. He, too, had clinical responsibilities and did no billing. ROA.5968. George-Scharpon was never asked how to bill a procedure:

Q:  So were you familiar with billing at all?

A:  No. I'm not familiar with the billing at the hospice at all. My sole goal and sole purpose was just taking care of these terminal patients and their family, what they're going through.

Q:  Did anyone from billing ever come to you and ask you any questions about the types of services you were providing?

A;  No, not that I recall.

ROA.5997-5998. To that end, George-Scharpon had no knowledge regarding Canon billing history and physical services; he focused solely on taking care of these patients. ROA.6007.

## Dr. Arup Nath

Dr. Nath worked at Canon Hospice in 2010; he was hired by Dr. Blalock: "Hey. We do need a physician at Canon if you want to help. This is something rewarding and helpful." ROA.5992-5993. Dr. Nath, as all other physicians who work at Canon Hospice, charted medical notes, not billing. ROA.5997. Dr. Nath was never asked about billing at Canon Hospice, ROA.5998, and did not have any knowledge or information regarding the billing of services. ROA.6007. To Dr. Nath, billing was secondary:

> ...I'm not familiar with the billing at the hospice at all. My sole goal and sole purpose was just taking care of these terminal patients and their family, what they're going through.

ROA.5997. Dr. Nath answered questions regarding patient JoMo (named in indictment), explaining his notes indicated the patient was not in crisis at one point. That diagnosis changed just months later. ROA.6002-6005. Dr. Nath explained in hospice, a patient may be discharged and return in crisis. ROA.6004. Dr. Nath further explained his detailed treatment of patients, especially how he determined treatment. ROA.6013-6020.

Even on rebuttal, Dr. Nath affirmed he did no billing. ROA.6025.

### Dr. Hassan Fares

Dr. Fares was an inpatient doctor at Canon Hospice. ROA.6076. He testified regarding two patients the government chose to demonstrate Canon Hospice's illegal billing (Indictment, ROA.13258-13268). Dr. Fares walked the jury through the medical records of En Wi, Government Exhibit 35.011, ROA.9119, ROA.6021, and JoMo, Government Exhibit 37.013, ROA.11036. He explained the treatment each patient received, how that treatment related to the GIP billing and whether the patients were being cared for at the level of care to justify the GIP billing that was charged for these patients in Counts 1 through 8. Dr. Fares, like all other physicians, testified that Dr. Akula never order him to provide a medical procedure or service that was not medically necessary. ROA.6074. Nor was he instructed or instruct anyone to bill separately for physician services. ROA.6077.

### Kelly Anderson

Kelly Anderson was administrator of the Northshore office of Canon

Hospice. ROA.6100.  She does not have a medical background. ROA.6102.

Anderson testified that billing was done by Rayeshwar Biyyam (Raj), Dr.

Akula's brother-in-law. ROA.6102, ROA.6104.

Anderson claimed Dr. Akula was involved in the day-to-day business,

concerned with patient census and the reason why a patient was discharged,

why the patient no longer met criteria for hospice care. ROA.6105-6107.

Early in her employment, Anderson had limited computer access. Once

she was given 'superuser' access she began reviewing the billing service for

the entire Canon Hospice operation. ROA.6160; ROA.6195. Anderson used the

private business information of Canon Hospice as the basis for a qui tam

whistleblower suit she filed in August 2017. ROA.6157. Anderson offered to

drop her claim against Dr. Akula for $500,000. ROA.6185. During her

testimony regarding medical records and associated billing records that

Anderson sent to her attorney (her boyfriend, ROA.6188, ROA.6199), the court

raised the question whether she violated HIPPA laws, since the documents

contained the names of patients. This issue was not clarified. ROA.6199-6213.

Anderson believed that Raj would change patient certification dates. ROA.6165. To resolve the billing issue that led to incorrect reports, Anderson discussed with Sue May disabling Raj's computer user rights. Anderson also testified that she and other employees demanded Dr. Akula get an outside billing company with a certified CPT coder. ROA.6175.

Dr. Akula agreed. ROA.6197.

### Suzanne Carol May

May is a licensed practical nurse with a special certification in hospice care. She also has a degree in health care administration. ROA.6234. May claimed she handled patient care, not billing. ROA.6237. When Canon Hospice underwent its 2017 audit, May unilaterally decided to falsify medical records. ROA.6266.

> I think when presented with the list of all the things that were wrong, those - - after the records had been evaluated, it was overwhelming and I think I was just - - it was - - just overwhelmed by everything that had not been done that I though had been done. And I made a not – not a good - - not a good judgment in that case, but I have - - I have admitted that I did it…

ROA.6267. She described an email Dr. Akula sent her and Anderson that said

"Full cooperation on this AUDIT is vital to Canon existence." ROA.12601. The audit indicated that the medical records were not precise or sufficient to justify the billing. ROA.6282. Therefore, May believed the email "influenced me to know that I needed to do something to make things right." ROA.6274.

Clarifying her fraudulent action was a unilateral decision, May, who controlled Canon Hospice billing, admitted she was not asked to alter any documents by either Dr. Akula nor his then-Attorney. ROA.6279; ROA.6282.

May also testified in rebuttal, attempting to deflect all blame on Dr. Akula. While she admitted Raj and another person billed Medicare, she claimed they were managed by Dr. Akula. ROA.6667. She claimed to have met with Raj to review billing and with Dr. Akula and the billing department to ensure the documentation was prepare properly and timely. ROA.6680, ROA.6682-6683.

May further claimed that she spoke with Anderson regarding the billing and Anderson – based upon apparent advice from her boyfriend attorney – told May she need not worry about erroneous billing. ROA.6715.  Yet in

January 2016, May and Anderson exchanged am email that claimed only those two persons were "getting successful billing." ROA.6719, ROA.13011.

May admitted under the Louisiana Administrative Code she was responsible for "all compliance with all regulations, laws, policies, and procedures applicable to hospice, specifically, and to Medicare and Medicaid issues when applicable." The Code also made her responsible for all billing. ROA.6723-6724; ROA.13059; ROA.13063. And she knew as early as 2014 that Raj, who reported to her, handle billing for physician services. ROA.6726. Yet, she claimed not to know what he was billing. ROA.6730.

**Demetria Ally**

Ally performed quality assurance work for Canon Hospice in 2017. ROA.6312. Ally worked to improve the company's performance, essentially the clinical aspect. ROA.6313. She made three important observations: (1) May was not a strong administrator; (2) the hospicesoft program to assist record keeping was not necessary; and (3) Canon billing employees lacked sufficient training to properly bill. ROA.6317-6319.

## Kelly Coleman

Coleman is the sister-in-law of Kelly Anderson. She went to work for Canon knowing her stepsister had a whistleblower suit. ROA.6342. Anderson claimed she worked on patient intake, not having any involvement with billing. ROA.6344. Coleman believed Raj did all billing. ROA.6346. Coleman recalled one incident in which she left on her computer and received a call from a nurse for her logon information. ROA.6353. She mentioned that Raj asked her twice to raise a patient's level of care. ROA.6355-6356.

## Laurie McMillan

McMillan was the government's key witness. A registered nurse, at the time of trial McMillan worked for Advize Health, a company of experts providing investigations, audits, and medical reviews. ROA.6370. Previously, she worked for Qlarant, hired by the Centers for Medicare and Medicaid Service to look for fraud, waste, and abuse in the billing of Medicare and Medicaid services. ROA.6370. McMillan earned $400 per hour for her work, while her employer earned an additional $100 per hour overhead. ROA.6374.

McMillan testified the government provided her certain medical records and billing data on six individuals for review. McMillan looked for certain codes within four levels of care: (1) 99236, code for admission and discharge description services, and the highest level of intensity, ROA.7759; (2) 99233, code for inpatient services, ROA.7755; and (3) 99350, code for home visits, ROA.8343. McMillan said since hospice is paid on a per diem – hospice treatment is paid at a set rate regardless of intensity of service – codes such as 0657 signal additional charges for extra physician services. ROA.6400. General Inpatient revenue code 0656 indicates those patients in need of pain or symptom control that cannot be delivered in an setting by an inpatient hospital. ROA.6654.

McMillan's conclusion on virtually every billing error was insufficient documentation ("... the documentation did not support the billing of additional physician services."). ROA.6404. More, McMillan claimed that many of the physician service charges are impermissible since these services are covered by the per diem hospice rate. ROA.6404, ROA.6406.

McMillan also claimed that Canon Hospice included code billing 99233 and 99236 during the general inpatient billing period, which is not an additional service that qualifies for payment. ROA.6406. Again, as the government had McMillan explain her review of six specific patients, she noted that Canon Hospice lacked paperwork:

> So what I found was the paperwork did not make those claims payable and then some of those patients there was a lack of documentation to support what would have a been a certificate of terminal illness.

ROA.6410. For example, regarding patient "JoMo" the data available to McMillan did not include documentation to support additional billing. ROA.6413. McMillan believed, absent the proper documentation, that the physician services Canon sought payment, were included in the per diem payment rate for hospice treatment. ROA.6413.

On this testimony, the parties agreed that the dates and beneficiaries (patients) alleged in Counts 1-8 matched the claims data obtained from Medicare. In other words, the parties agreed the claims were made for those particular beneficiaries on those particular days. ROA.6421.

McMillan testified at least three more times on direct examination that her review revealed a lack of paperwork to support the claims. For example,

1.   "And again the documentation did not support the regulation for billing that additional physician service under the hospice benefit." ROA.6432.

2.   "My conclusion was, again, that the documentation did not support the billing for GIP level of care ...." ROA.6433.

3.   "The documentation did not support billing for additional physician services under the hospice benefit." ROA.6435.

McMillan also testified many claims might not be payable because of a procedural failure to follow the intricacies of Medicare. ROA.6437. In the same vein, the failure to follow the Medicare procedures does not mean the person was not eligible for the services provided. ROA.6437.

On questioning from the court – direct to the issue whether Dr. Akula committed criminal activity – McMillan could not say the billed medical procedures were unnecessary.

The Court:     I just want to clarify something. Whether the documents are appropriate or inappropriate or sufficient or insufficient is a different question as far as whether the patient, from a medical

|  | standpoint, needs hospice care; is that correct? |
|---|---|
| McMillan: | Yes. So as a medical reviewer I'm only making decisions based on what is documented. I don't have it [sic[ to make a decision based on it. |

ROA.6441. McMillan repeated under CMS policy the lack of documentation means the procedure did not occur. In other words, a reviewer utilizes only the available documentation to find support for a particular procedure. Whether the procedure was necessary is not at issue. ROA.6442-6443.

McMillan also agreed that while additional physician services billed on a hospice claim are rare, the inclusion of billing code 99236 would indicate use of the incorrect code. ROA.6449: "... we think they're the wrong codes, it causes us to look at the documentation and I did not find any documentation supporting those services billed." ROA.6449. So, while McMillan testified such claims were not payable as coded, she could not say the billing was fraudulent. ROA.6382-6383, ROA.6384, ROA.6430, ROA.6434. McMillan agreed these patients (named in the indictment) required an unusually high level of care. ROA.6464-6465. She merely disagreed with the level of care.

Rather than in-patient care, McMillan wanted these patients to be treated with "routine hospice care" by a nurse at home. ROA.6465.

Subsequent to this testimony and that of Dr. Akula – best described in support of his assignment of error 2, lack of evidentiary support to sustain the verdict – the jury found Dr. Akula guilty on all counts. ROA.2624-2630.

After trial, Dr. Akula filed for relief under F.R.Cr.P. 29, ROA.2911, and F.R.Cr.P. 33, ROA.2756.[1] The trial court denied both motions. ROA.4698.

The court conducted a sentencing hearing on May 15, 2024. The court recognized a necessary adjustment to the sentence guideline range and to the amount of restitution, explained in an extensive order. ROA.4976. The court imposed an upward variance, ultimately sentencing Dr. Akula to 240-months incarceration, ROA.7089, and calculating restitution in excess of $42 million to Medicare and $219 to Blue Cross and Blue Shield of Louisiana. ROA.7090.

Dr. Akula timely filed a notice of appeal. ROA.5030, RE 2.

---

[1] Dr. Akula properly moved for a Rule 29 judgment of acquittal after the government's presentation of evidence. ROA.6467.

## SUMMARY OF THE ARGUMENT

The appeal in this matter presents three key assignment of errors.

First, the trial court denied qualifying Dr. Greg Davis as a coding expert. Dr. Davis, called as a witness for Dr. Akula, explained to the court his extensive experience in medical coding, *i.e.*, that he used medical coding approximately 25 times daily for five days a week for at least 19 years. Dr. Davis also had experience teaching coding. More, Dr. Davis took classes, studied for and passed, a certification exam. But the court seemed more concerned with Dr. Davis's failure to obtain his certificate to hang on his wall, referring to the lack of certificate at least three times. Yet, despite Dr. Davis's extensive experience, the trial court denied Dr. Akula's attempt to have him qualified as an expert to counter the government's paid expert, who is not a doctor but hired to search for mistaken coding that can be construed as fraud.

This court has held an expert is a person with "sufficient specialized knowledge to assist the jurors in deciding the particular issues." *Tanner v. Westbrook*, 174 F.3d 542, 548 (5th Cir. 1999), *reh'g denied*, 192 F.3d 128 (5th Cir.

1999)(*en banc*). And this court has not based expertise on a piece of paper, rather focusing rather on the witness's experience in a given field. *Mike Hooks Dredging Co. v. Marquette Transp. Gulf-Inland, LLC,* 716 F.3d 886, 894 (5th Cir. 2013); *United States v. West*, 58 F.3d 133, 140 (5th Cir. 1995); and *Huval v. Offshore Pipelines, Inc.*, 86 F.3d 454, 458 (5th Cir. 1996). The court erred in not qualifying Dr. Davis as an expert. And that error is not harmless, but substantial, requiring vacatur of the conviction and a new trial.

Second, the government never proved that Dr. Akula committed health care fraud. While the government showed numerous errors in coding and the lack of documentation for certain medical procedures, not one witness or any document or documents show fraud. The medical coding and medical documentation of Canon Hospice was admittedly in disarray. But proof of fraud, rather than evidence of mistakes, is lacking. In failing to prove its case, the government did not present testimony from Rayeshwar Biyyam (Raj), consistently held out as the person responsible for Canon Hospice's Medicare billing. Absent documentary or testimonial evidence, the government cannot

prove health care fraud by inferring that Dr. Akula intended or had the *mens rea* to act in a criminal manner.

Finally, the upward variance imposed by the court results in an unconstitutionally excessive sentence. The 52-month upward variance to the guideline high-end range is already carried in the guideline range. The increase is not warranted and because of medical circumstances serves as an unduly harsh 240-month period of incarceration. The sentence should be vacated with instruction to the trial court to sentence within the guidelines, absent an upward variance.

## ARGUMENT

Dr. Shiva Akula was denied his constitutional right to present a defense when the trial court denied qualifying Dr. Greg Davis as an expert in medical coding. Not only did Dr. Davis do all of his own coding in his practice, he took the class for certified coders and billers and passed the exam the first time. He merely never requested the certificate to hang upon his wall.

Coupled with that error by the court, the government failed to present

sufficient evidence to demonstrate that Dr. Akula committed health care fraud. The evidence overwhelming shows billing errors and lack of documentation. It does not show any fraudulent behavior or that Dr. Akula knowingly or willfully acted with knowledge to commit health care fraud.

And ultimately, the trial court imposed an upward variance which results in an unconstitutionally excessive 240-month sentence.

## 1.    The trial court erred by not qualifying Dr. Greg Davis as an expert.

Denying expert designation to a board-certified family practitioner with numerous years experience who performed his own Medicare and insurance coding for thousands of patients, some of whom received hospice care, is an abuse of discretion that warrants vacatur of the verdict.

### *Standard of Review*

The admission or exclusion of expert testimony is reviewed for abuse of discretion. *Huss v. Gayden*, 571 F.3d 442 (5th Cir. 2009), *reh'g denied*, 585 F.3d 823 (5th Cir. 2009), *cert. denied*, 559 U.S. 1007, 130 S.Ct. 1892, 176 L.Ed.2d 365 (2010). The trial judge has wide latitude in determining the admissibility of

expert testimony, and the discretion of the trial judge and his or her decision will not be disturbed on appeal unless manifestly erroneous. A manifest error is one that is plain and indisputable, and that amounts to a complete disregard of the controlling law. *Puga v. RCX Solutions, Incorporated*, 922 F.3d 285, 293 (5th Cir. 2019)(internal quotation marks and citations omitted).

## Argument and Discussion

Dr. Greg Davis was called as a witness to counteract the government's coding expert. Dr. Davis provides outpatient internal medicine in a community of former migrate farmworkers, at least of whom have Medicare. ROA.6615. Those not on Medicare do not have insurance. ROA.6615. Dr. Davis understands the use of codes and uses coding for each patient.

Dr. Davis graduated from Illinois Medical School in 1978. After he completed a residency, in 1981 he became board certified in family medicine. ROA.6615-ROA.6616. He retains that certification 44 years later. ROA.6616. After practicing in two-person family group practice, which grew to four, Dr. Davis returned to solo practice until he closed his practice in 2018 to enter a

clinical practice. ROA.6616. As a sole practitioner, Dr. Davis

> "... not only billed, but I did all of my own coding. I ran both the clinical and the administrative component of my practice."

ROA.6617. That billing and coding resulted from treating patients both young and old, leaning to very elderly since Dr. Davis "was also the medical director of four different nursing homes through his career ...." ROA.6617. Dr. Davis testified that had "thousands of Medicare patients" during his solo practice. ROA.6617. These patients included those who required hospice care:

> You know by virtue of having this elderly population some of them, not all, certainly, but some of them would develop chronic disease states, meant they would qualify for hospice and many of them then went into hospice and I would up caring for them, providing their medical care while they were in the hospice until their death.

ROAA.6618. The treatment of these Medicare patients caused Dr. Davis to bill "thousands and thousands of individual episodes." ROA.6620. Dr. Davis has coded to bill Medicare 25 times a day for approximately 19 years. ROA.6624.

Starting in 2000, Dr. Davis "did all of the coding for [his] practice, which included inpatient, outpatient, hospice, nursing home." ROA.6620. He learned

by attending a 12-16 hour in-person class that certified coders and billers take before the certification test. The training included coding for hospice patients. ROA.6625. And, after self-educating for a period, Dr. Davis "took and passed the examination on the first try." He merely failed to request the certificate but "had all of the academic background." ROA.6621-ROA.6622.

Dr. Davis taught others. He has lectured for several years on the relationship between coding and the severity and intensity of illnesses:

> [The coding] has to do with transmitting information to payers about how sick a patient is.... It's – there is a component of coding that has to do with what's the correct code to identify the diagnosis of a patient. That's one possible component. The second component is, is – what's the appropriate code to – to describe the services that were provided, history, physical examination, medical complexity. Then there's another code that's available that also tells about how sick the patient is.

ROA.6623-ROA.6624. Despite Dr. Davis's extensive medical background, his coding on a daily basis, and his lecturing others on how to properly code, the trial court deny the defendant's request to have him qualified as an expert. The court found Dr. Davis has never written on the topic, had not previously qualified as a expert, and had a "lack of detailed expertise in this area other

than the fact that he has billed for so many years." ROA.6628. The trial court, upon agreement of counsel, qualified Dr. Davis as an expert in clinical decision making regarding hospice eligibility.  ROA.6635.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which states that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods, and (d) the expert has reliably applied the principles and methods to the facts of the case.

The rule is a codification of the Supreme Court's landmark case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The rule is not always specifically applied.  For example, in *United States v. Brown*, 871 F.3d 352, 357 (5th Cir. 2017), this court held expert testimony in a health care fraud criminal prosecution does not require the "cutting-edge scientific evidence for which the *Daubert* factors are often

most vigorously contested." In other words, whether the *Daubert* opinion factors are even pertinent for assessing reliability in a given case will depend upon the nature of the case, the expert's particular expertise, and the subject of his or her testimony. *United States v. Diaz*, 2008 WL 906725 (S.D. Fla. 2008), citing *Brown*. Ultimately, "[a]n expert's testimony does not always have to be based on scientific testing; it can be based on personal experience." *Kozak v. Medtronic, Inc.*, 512 F.Supp.2d 913, 918 (S.D. Tex. 2007).

The standard for qualifying expert witnesses is fairly liberal. A witness need not have specialized expertise in the area directly pertinent to the issue in question if the witness has qualifications in the general field related to the subject matter in question." *Guzman v. Mem'l Hermann Hosp. Sys.*, 2008 WL 5273713 (S.D. Tex. Dec. 17, 2008). "Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss* 571 F.3d at 455. The inquiry is whether a particular expert has "sufficient specialized knowledge to assist the jurors in deciding the particular issues." *Tanner v. Westbrook*, 174 F.3d 542, 548 (5th Cir. 1999), *reh'g*

*denied*, 192 F.3d 128 (5th Cir. 1999)(*en banc*)(quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999);

In a jury trial setting, the trial court's role under Rule 702 is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role – the court's role is limited to ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue so that it is appropriate for the jury's consideration. *Puga, supra.* Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. *Daubert*, 509 U.S. at 596. Ultimately, whether an individual is qualified to testify as an expert is a question of law. *Mathis v. Exxon Corp.*, 302 F.3d 448, 459 (5th Cir. 2002), *reh'g denied*, 48 Fed.Appx. 919 (*en banc*), citing F.R.E. Rule 104(a).

For at least three reasons the trial court abused its discretion in refusing to qualify Dr. Davis as a coding expert, any of which suffice as an error affecting Dr. Akula's substantial rights.

**A.    Whether Dr. Davis had previously qualified as an expert is irrelevant to his qualification to testify as a medical coding expert witness for Dr. Akula.**

The trial court considered that Dr. Davis's previous lack of qualifying as an expert in medical coding a factor in denying his qualification. ROA.6628. The mere fact that Dr. Davis has never been qualified as an expert is irrelevant. Under F.R.E. 702, a witness can qualify as an expert based "on practical experience as well as academic or technical training," *United States v. Parra*, 402 F.3d 752 (7th Cir. 2005), not on the number of times he or she has been qualified by a court.  Thus, the mere fact that Dr. Davis has never been qualified as an expert is irrelevant. Even a first-time "expert" may qualify as an expert witness. See *United States v. Locascio*, 6 F.3d 924 (2d Cir. 1993), *cert. denied*, 511 U.S. 1070, 114 S.Ct. 1646, 128 L.Ed.2d (1994)("[E]ven the most qualified expert must have his first day in court.")

By the court's inference, no witness would ever qualify as an expert for the first time because that would require being retained previously as an expert. *Catapult Communications Corp. v. Foster*, 2010 WL 659072, p. 2 (N.D. Ill.

2010)(not reported), *objections denied*, 2010 WL 3951973 (N.D. Ill. 2010).(The mere fact that McWilliams never has been retained as an expert is irrelevant. By that logic, no witness could ever qualify as an expert for the first time because that would require being retained previously as an expert. In sum, McWilliams' practical experience qualifies him as an expert). By requiring Dr. Davis to have been qualified beforehand as an expert, the court places an extra burden on Dr. Davis. As pointed out by the Louisiana Second Court, "There is no rule of law, statutory or jurisprudential, which requires that different standards be placed on those witnesses who seek to be qualified as an expert in a field for the first time. Rather, the same standard of competency applies to all and a trial judge is only required to satisfy himself that the witness' competency has been established prior to qualifying him as an expert...." *State v. Smith,* 448 So.2d 778, 780-781 (La. App. 2 Cir. 1984).

## B.    The trial court unduly focused on Dr. Davis's lack of a coding certificate.

A second ground given by the trial court for not recognizing Dr. Davis as a medical code expert was his lack of a certificate for his classwork as a

medical coder. Dr. Davis learned medical coding through a 12-16 hour in-person class. ROA.6625. The class provided instruction on coding for hospice patients. ROA.6625. After passing the certification exam on first try, Dr. Davis merely failed to request the certificate; he did not need the certificate since he learned the coding for his own practice. ROA.6621-6622.

Dr. Davis's failure to obtain the certificate seemingly bothered the trial court, causing the trial judge to make three references to the certificate. ROA.6621 (twice) and ROA.6622 (again asking Dr. Davis why he did not obtain the certificate).

The lack of a certificate is of limited significance. Generally, obtaining a certificate after training is little more than a formality. Dr. Davis attended class, studied for, and passed the necessary examination. He wanted to properly apply coding to his practice.

More, as a matter of law, an expert witness does not need a "certificate" in the field of testimony. "Daubert demands reliability, not evidence of certification, and if nothing else, experience indicates that the fact that

someone holds a degree or licence does not ipso facto indicate that he or she possesses reliable knowledge." *Natchez Reg'l Med. Ctr. v. Quorum Health Res., LLC,* 879 F. Supp.2d 556, 577 (S.D. Miss. 2012) (citation omitted).

In *Davis v. United States*, 2011 WL 7053628, p. 2 (S.D. W. Va. 2011), the plaintiff argued testimony from the government's expert should be excluded since she was not qualified to testify as a life care planner. The court, after conducting an analysis under F.R.E. 702, concluded that "despite [the] lack of certification" by the International Commission of Health Care Certification, the expert possessed the "knowledge, skill, and experience necessary to qualify as an expert ...." In *Hart v. Broomfield*, 97 F4th 644 (9th Cir. 2024), *aff'd, certificate of appealability denied*, 2024 WL 13322715 (9th Cir. 2024), *cert. denied*, 145 S.Ct. 1334 (2025), the plaintiff was sentenced to death for murder, and rape, sodomy, and forced copulation of a minor. In a habeas proceeding, Hart claimed his trial counsel was ineffective for failing challenge the government's expert for lacking certification in forensic pathology or rape trauma. The appellate court concluded Hart had no ground to challenge the physician's

qualifications, the lack of certification not relevant in light of board certification in pathologic anatomy and clinical pathology, more than 5,000 autopsies, and testimony in numerous other cases.

The State of Louisiana, whose expert testimony statute mirrors the federal statute, finds the lack of a certificate is no bar to expert testimony. In *State v. Schlessinger*, 525 So.2d 50, 52–53 (La. App. 2 Cir. 1988), the court, in summarizing jurisprudence, reiterated that the expert witness's lack of a college or advance degree does not bar qualifications as an expert witness: "It is not necessary for one to take a special course in a particular subject in order to become expert therein unless the subject be of such a scientific nature that skill or adequate knowledge of it cannot be attained by practical experience and observation." *Schlessinger*, 525 So.2d at 53.

Similarly, in *Cedar Lodge Plantation, L.L.C. v. CSHV Fairway View I, L.L.C.*, 753 F. Appx 191, 195-96 (5th Cir. 2018), this court recognized that "[a] witness qualified as an expert is not strictly confined to his area or practice but may testify regarding related applications; a lack of specialization goes to the

weight, not the admissibility of the opinion," rely upon *Perez v. Boecken*, 2020 WL 3074420, p. 11 (W.D. Tex. 2020)(rejecting argument that witness's "experience as a practicing nurse, nurse consultant, and owner of a medical bill auditing business" failed to provide her with the education or training needed to qualify as an expert on reasonable medical charges).

The lack of a certificate is insufficient to disqualify Dr. Davis as an expert witness. Dr. Davis testify under oath he completed all qualification for certification as a medical coder. And he explained that completing the process "was ... done for the purposes of his own practice" for which he did not need a certificate. ROA.6622-ROA.6623.

### C.    Dr. Davis has the knowledge, skill, and experience to educate the jury about medical coding.

The ultimate test for qualification as an expert witness is whether the proposed witness possesses a higher degree of knowledge, skill, experience, training, or education than an ordinary person in the subject matter of the testimony. *United States v. Cooks*, 589 F.3d 173 (5th Cir. 2009), *cert. denied*, 559 U.S. 1024, 130 S.Ct. 1930, 176 L.Ed.2d 397 (2010). Dr. Davis testified that he has

coded medical billing approximately 25 times daily for five days weekly, for 19 years. ROA.6624. Thus, Dr. Davis has coded more than 123,000 incidents, which includes the three codes that most interested the government. ROA.6625-6626. Even to the day he testified, Dr. Davis continued to code:

> In the process of where I'm currently employed I have to code. I have to - - so I have to determine which ENM code would apply, the evaluation and management code. I have to determine what diagnostic code to apply to that particular case, but I do not submit the codes. So I determine what the codes are, both the diagnosis codes and the evaluation and management codes, but the - - actually the processing or the submitting of that to Medicare, the transmittal to Medicare, I do not do.

ROA.6649. Courts have found persons with similar experience qualified to testify as expert witnesses. For example, in *United States ex rel. Montcrieff v. Peripheral Vascular Associates, P.A.*, 507 F.Supp.3d 734, (W.D. Tex. 2020), *aff'd in part, rev'd in part and remanded,* 133 F.4th 395 (5th Cir. 2025), the defendant argued the government's expert did not possess the expertise to provide opinions regarding PVA's practices or Medicare billing requirements.

PVA argued the expert witness's background was in general surgery, not in vascular surgery, ultrasound studies, or medical coding. *PVA*, 507 F.Supp3d at 749. In particular, PVA asserted the government's doctor lacked the requisite knowledge to support Relators' theory of liability and had no specialized knowledge about the use of MedStreaming – an archiving and communications system to manage workflow and reporting – in clinical practice. *Id.* The government responded its expert's education, training, affiliations, and accreditations qualified him to provide opinion on Medicare claims for diagnostic ultrasounds. Additionally, the government presented evidence that Dr. Alexander's expertise in Medicare billing requirements came from his role as the head Medical Director for Medicare in Texas and his experience overseeing the implementation of billing, coding, and Medicare compliance policies with Blue Cross and Blue Shield of Texas.

The Court found the expert was qualified to testify and give opinion on Medicare-billing best practices, citing several cases from this court: *Brown*, supra; *Mike Hooks Dredging Co. v. Marquette Transp. Gulf-Inland, LLC*, 716 F.3d

886, 894 (5th Cir. 2013) (affirming the lower court's admission of an expert based on his experience in maritime navigation); *United States v. West*, 58 F.3d 133, 140 (5th Cir. 1995) (admitting an IRS agent as expert witness on tax evasion based on her work experience and accounting education); and *Huval v. Offshore Pipelines, Inc.*, 86 F.3d 454, 458 (5th Cir. 1996) ("Given [the expert']s broad, general experience in the insurance industry, we cannot say that the district court abused its discretion in qualifying him as an expert witness.").

Another example is *United States ex rel. Armfield v. Gills*, 2012 WL 12918276 (M.D. Fla. 2012) (not reported), where the court found a doctor's broad experience in the field of ophthalmology and complying with Medicare rules and regulations qualified her as expert in case which defendant alleged to have violated False Claims Act by billing false claims to Medicare. The record reflected the expert had more than 30 years of experience as a practicing ophthalmologist and was a diplomat and fellow with the American Board of Ophthalmology.

In addition, the doctor conducted thousands of cataract surgeries throughout her career and had been personally involved in making coding decisions with respect to Medicare claims for procedures she performed, submitting claims to Medicare under CPT 66825 for "repositioning" a lens and has personal knowledge regarding Medicare coverage relating to such procedures. In light of this broad experience, particularly complying with Medicare rules and regulations qualified her as expert in case which defendant alleged to have violated False Claims Act by billing false claims to Medicare. *Gills*, p. 1.

While Dr. Davis has comparable skills to the experts in the cited examples, the court's concern about his lack of *detailed experience* is insufficient to disqualify him as a expert witness. The qualification requirement of Rule 702 holds two principles in tension. On one hand, an expert must be able to testify "in a particular field or on a given subject." On the other hand, "Rule 702 does not mandate that an expert be *highly* qualified in order to testify about a given issue." *Huss at* 452. Rather, differences in expertise bear chiefly

on the weight to be designed to the testimony by the trier of fact, not its admissibility. *Huss,* supra; *Daubert*, 509 U.S. at 596. Also see *Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 782 (3rd 1996)(reasoning that "most arguments about an expert's qualifications relate more to the weight to be given the expert's testimony than to its admissibility").

The trial court erred as a matter of law in refusing to allow Dr. Davis as an expert in medical coding. The court affected a substantial right belong to Dr. Akula, *i.e.*, his Sixth Amendment right to present a defense. *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)(Few rights are more fundamental than that of an accused to present witnesses in his own defense.) In such situations, this court has held the constitutional right to present a defense may be violated by "evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *United States v. Njoku*, 737 F.3d 55 (5th Cir. 2013), *cert. denied*, 572 U.S. 1127, 134 S.Ct. 2319, 189 L.Ed.2d 196 (2014)

(quoting *Holmes v. South Carolina*, 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006)).

This error also gave the jury a one-sided view whether Dr. Akula improperly coded medical procedures. The government claimed that Dr. Akula fraudulently coded medical procedures to enhance payment under the Medicare system. The government presented Laurie McMillan. ROA.6369. McMillan is a registered nurse who claimed to have completed the professional coding program. ROA.6372. McMillan did not acknowledge, nor was she asked by the court, whether she had a certificate. Rather, McMillan relied upon her hospice fraud investigations experience. ROA.6373.

The court applied a higher standard to Dr. Davis. This error obviously influenced the jury and its thought process. During deliberations the jury asked the court to remind it of the number of the "prosecution's expert witness" to which the court replied "Look to Exhibit 20.002 (Government Exhibit)." ROA. 6832, ROA.8433.[2] This request does not lead to speculation

---

[2] Although the defendant did not object to the court's proposed response, the question does not clearly indicate the jury wanted McMillan's report. The failure of Dr. Akula's attorney

regarding the influence of an expert on the jury but serves as overwhelming evidence that the jury was solely focused on the testimony of Laurie McMillan and her report. Similarly, the request also points to the lack of any competing testimony by a witness for Dr. Akula.

Dr. Davis is certified in coding and billing, has been for years, and continues to code claims even now. He has taught physicians how to code diagnoses and how to determine the severity of a claim. Disqualifying Dr. Davis as an expert is a drastic measure. Disqualifying a witness is applied only hesitantly, reluctantly, and rarely. *Hewlett-Packard Co. v. EMC Corp.*, 330 F.Supp.2d 1087 (N.D.Cal. 2004).

The court supplanted Dr. Greg Davis's expertise, education, and practical knowledge of medical coding with peripheral concerns not supported by the jurisprudence.

This court cannot view this substantial right of Dr. Akula in a light where the trier of fact would have found the defendant guilty beyond a

---

to catch this error led to his ineffective counsel claim in his Rule 33 motion. ROA.2756.

reasonable doubt with the additional evidence inserted. *United States v. Wen Chyu Liu*, 716 F.3d 159 (5th Cir. 2013), *cert. denied*, 571 U.S. 1167, 134 S.Ct. 1011, 187 L.Ed.2d 858 (2014)(cleaned up).

Rather, this court must conclude that the lack of evidence swayed the jury and had a substantial effect on its verdict. *Wen Chyu Liu*, quoting *Kelly v. Boeing Petroleum Servs., Inc.*, 61 F.3d 350, 361 (5th Cir. 1995)(We must, though, be sure after reviewing the entire record, that the error did not influence the jury or had but a very slight effect on its verdict.*). See DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679 (5th Cir. 2003)(reversing judgment for improper evidentiary ruling that allowed jury to rely on erroneously admitted lay evidence on loss profits); *United States v. Malmquist*, 92 F.4th 555 (5th Cir. 2024)(government's breach of plea agreement affected defendant's substantial rights resulting in vacatur of sentence and remand for sentencing).

The remedy for this error is vacatur of the conviction or a new trial.

**2.     The government failed to demonstrate Dr. Akula knowingly or willfully acted with knowledge to commit health care fraud.**

A compilation of the government's evidence, whether testimonial or documentary, does not prove that Dr. Akula committed health care fraud. The government attempted to compile mistake upon mistake to infer criminality. But while the evidence admittedly establishes that Canon Hospice had errors in its coding and Medicare billing, the evidence fails to establish that the mistakes or errors were other than that, purposely done to commit fraud.

More, the person responsible for billing at Canon Hospice was not called to testify. Nor was his absence explained.

### Standard of Review

When a defendant has timely moved for a judgment of acquittal under Rule 29, this court reviews a challenge to the sufficiency of the evidence *de novo*. *United States v. Gandy*, 795 Fed.Appx. 225 (5th Cir. 2019), citing *United States v. Winkler*, 639 F.3d 692 (5th Cir. 2011); *see United States v. Resio-Trejo*, 45 F.3d 907, n. 6 (5th Cir. 1995).

Because Dr. Akula raised his sufficiency challenge at the close of evidence, ROA.6467, and after trial, ROA.2911, the standard of review is whether a reasonable jury could find that the evidence establishes the guilt of the defendant beyond a reasonable doubt, *United States v. Garcia*, 99 F.4th 253 (5th Cir. 2024), *i.e.*, whether the evidence established the essential elements of the offense beyond a reasonable doubt." *United States v. Moreland*, 665 F.3d 137, 148-49 (5th Cir. 2011). In determining whether this standard is met, the court "view[s] the evidence in the light most favorable to the verdict and drawing all reasonable inferences from the evidence to support the verdict." *United States v. Percel*, 553 F.3d 903, 910 (5th Cir. 2008), *cert. denied*, 556 U.S. 1213, 129 S,Ct, 2065, 173 L.Ed. 1143 (2009).

However, a "verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996); see also *United States v. Fitzharris*, 633 F.2d 416 (5th Cir. 1980), *cert. denied*, 451 U.S. 988, 101 S.Ct. 2325,

68 L.Ed.2d 847 (1981)("[A] conviction cannot rest on unwarranted inference, the determination of which is a matter of law.").

Meanwhile, Federal Rule of Criminal Procedure Rule 33 allows a court to "vacate any judgment and grant a new trial if the interest of justice so requires." *United States v. Foster*, 2024 WL 3991455 (5th Cir. 2024)(not reported), citing *United States v. Turner*, 674 F.3d 420 (5th Cir. 2012), *cert. denied*, 568 U.S. 898, 133 S.Ct. 302, 184 L.Ed.2d 178 (2012). The denial of a motion for new trial is reviewed for abuse of discretion, evaluating questions of law *de novo*. *United States v. Caballero*, 2024 WL 3175453 (5th Cir. 2024)(not reported), citing *United States v. Pratt*, 807 F.3d 641, 645 (5th Cir. 2015).

### Discussion

While the verdict is viewed in a light most favorable to the government, the Due Process Clause protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In other words, this court must determine whether any

rational jury could conclude from the evidence presented at trial that the government proved all of the elements of the offense beyond a reasonable doubt. *United States v. Carbajal*, 290 F.3d 277, 289 (5th Cir. 2002), *writ denied*, 537 U.S. 934, 123 S.Ct. 34, 154 L.Ed.2d 235 (2002).

In doing so, the court's review, imbued as it is with deference, nonetheless necessarily requires this court to consider trial evidence that countervails the jury's verdict, and allows the appellate court to "draw upon only reasonable inferences from the evidence to support the verdict." *Moreland*, supra at 149 (5th Cir. 2011) (internal quotation marks and citation omitted). Thus, viewing the evidence in its entirety, circumstances that merely raise a suspicion of guilty is not sufficient to support a conviction. *Garrison v. United States*, 163 F.2d 874 (5th Cir. 1947).

**A.    The evidence in insufficient to prove Dr. Akula committed health care fraud.**

To prove health-care fraud in violation of 18 U.S.C. § 1347, the government must present sufficient evidence to establish beyond a reasonable doubt that Dr. Akula "knowingly and willfully execute[d], or attempt[ed] to

execute, a scheme or artifice — (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services." *United States v. Imo*, 739 F.3d 226, 235–36 (5th Cir. 2014)(quoting 18 U.S.C. § 1347); see also *United States v. Girod*, 646 F.3d 304, 313 (5th Cir.2011).

Both charges require proof of knowledge and specific intent to defraud. See, e.g., *United States v. Brooks*, 681 F.3d 678, 699 (5th Cir.2012), *cert. denied,*568 U.S. 1085 (2013); *United States v. Garcia*, 432 Fed.Appx. 318, 326 (5th Cir.2011) (unpublished)(citing *United States v. Hickman*, 331 F.3d 439, 443–45 (5th Cir.2003)). However, this proof may be inferred from circumstantial evidence. *United States v. Whitfield*, 485 Fed.Appx. 667, 670 (5th Cir.2012) (unpublished) (citing *United States v. Ismoila,* 100 F.3d 380, 387 (5th Cir.1996)).

In short, to prove health care fraud, the Government must provide evidence of false claims submitted to a health care benefit program. *United*

*States v. Garcia*, 432 Fed.Appx. 318 (5th Cir. 2011). The government alleged in its indictment that Dr. Akula violated the health care statute, *inter alia*, by (1) improperly billing for general inpatient care – to maximize reimbursement – when those services were not medically necessary, (2) instructing employees to admit the beneficiary (patient), then bill at the elevated rate; and (3) billed for physician services for patients who were receiving general inpatient care in addition to the daily per diem rate. ROA.13258-13268, RE 3.

While Canon Hospice may have submitted miscoded claims, it did not do so with the intent to commit fraud. Incorrect claims, in and of themselves, do not establish intent, or *mens rea*, to defraud the United States government. By definition, fraud of any kind involves deceit.[3] Because Canon Hospice did, in fact, provide the services for which it billed, its owner, Dr. Akula, is not guilty of health care fraud, no matter Canon's incomplete charting or erroneous coding.

---

[3] In Blacks Law Dictionary (9th ed.), the definition of 'deceit,' p. 465, is nearly the same as the definition of 'fraud,' p. 731.

Judgment of acquittal was proper. In the most objective of evaluations, the aforementioned testimony does not establish health care fraud. Other than a consistent pattern of poor documentation (medical records) or incorrect coding, the government failed to produce any evidence that Dr. Akula directed any employee to ignore medical records or change diagnosis codes to trigger higher Medicare reimbursements.

Nor is there evidence to prove Dr. Akula engaged in a scheme to charge for services not provided. The only evidence of wrongdoing belongs to Suzanne Carol May, who admitted to altering medical records. Even May could not link Dr. Akula to any wrongdoing. And the government's expert, again and again, indicated the records she reviewed contained insufficient documentation or coding that would be incorrect.

As the testimony established, Raj was the problem. And since only Raj could explain what he did, why he did it, and whether Dr. Akula ordered he code a particular procedure a certain way, the government lacked sufficient evidence to demonstrate Dr. Akula committed health care fraud.

In *United States v. Elfenbein*, 708 F.Supp.3d 621 (D.C. Md. 2023), *on appeal*, 24-4048 (4th Cir. 2024), the defendant was also charged with violating 18 U.S.C. §1347, for submitting false claims for medical services provided during COVID-19. *Elfenbein*, p. 2. In consideration for relief under F.R.Cr.P. 29[4] and F.R.Cr.P. 33, the trial court found the government did not carry its burden to prove the defendant submitted false billing. The court concluded neither the government's expert nor lay witnesses provided sufficient testimony to show that Elfenbein improperly filed for reimbursement at a higher rate. The code also found the relevant codes and related definitions were ambiguous, subject to multiple interpretations, and were not sufficient to place the defendant on notice regarding precise reporting. *Elfenbein*, p. 41.

> "... the fraud statutes do not cover all behavior which strays from the ideal" and "not all conduct is a scheme or artifice to defraud."

*Elfenbein*, p. 41, citing *United States v. Colton*, 231 F.3d 890, 901 (4th Cir. 2000).[5]

---

[4] Under Rule 29, if the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether a motion for new trial should be granted if the judgment of acquittal is later vacated or reversed.

[5] While *Elfenbein* is current and instructive, Dr. Akula acknowledges that in light of the Rule 29 judgment of acquittal, the matter is on appeal.

Here, the government argued Dr. Akula committed health care fraud by relying upon claims and codes. The government did not provide evidence to show the medical services were not necessary or not provided.

In fact, in his Rule 33 motion, Dr. Akula described in detail the condition and treatment each expert received. McMillan, again only looking for codes, overlooked this critical information. To wit,

- Patient JoMo was ninety-five years old when he came to hospice, and he died within four months of entering hospice care. JoMo had significant medical problems including complications from a stroke, dysarthria (slurred speech), an inability to care for his own hygiene, and weakness on the left side of his body. These conditions required extensive medical care. The indictment charged Dr. Akula for improper GIP billing using the CPT codes 99233 and 99236 for Patient JoMo. Ms. McMillan's admitted expert report was critical of this GIP billing under CPT code 99233 based on Ms. McMillan's opinion that the documentation, but not the actual multiple diagnosis and pain medications that were required to keep Patient JoMo, as being not justified for billing at GIP rate. (ECF 1).

- Patient CaDa was sixty-eight years old. CaDa had suffered from "moderate-mental retardation" since birth and required more care than most patients. She also had "debilitating dementia," epilepsy, and incontinence. CaDa had been institutionalized for most of her life and needed to

be so during her time in hospice. The indictment charged Dr. Akula for improper home hospice services for CaDa. (ECF 1). Yet Ms. McMillan's admitted expert report included criticism for GIP billing for Patient CaDa. The billing records showed CaDa was billed under CPT code 99350 with a modifier "GV" that reflected nurse practitioner home care visits. The billing documents were correct.

- Patient EtWi was ninety-one years old when she came to the facility. She had dementia, congestive heart failure, hypertension, syphilis, and neurological problems caused by syphilis. She was at Canon Hospice for three months. EtWi received the maximum FAST score which put her in the category of the patient suffering from the worst dementia. The indictment charged Dr. Akula with improper GIP billing for Et Wi. Ms. McMillan's admitted expert report was critical of this GIP billing under CPT code 99233 based on Ms. McMillan's opinion that the documentation, but not the actual multiple diagnosis and pain medications that were required to keep Patient EtWi, as being not justified for billing at GIP rate. (ECF 1).

- Patient PrAl was sixty-nine years old when she came to the facility. She suffered from a "brainstem stroke," and inability to swallow and had to be fed through a tube, cerebral edema, malignant hypertension, Parkinson's Disease, dementia, hypothyroidism, and she could not straighten her limbs. The indictment charged Dr. Akula for improper home hospice services for CaDa. (ECF 1). Ms. McMillan's admitted expert report included criticism for GIP billing. The billing records showed PrAl was billed under CPT code 99350 with a modifier "GV" that reflected

nurse practitioner home care visits. The billing documents were correct.

- Patient YvDu was seventy-five years old when she came to the facility. She had aggressive colon cancer, diabetes, hypertension, had to wear a colostomy bag, dementia, and expressed that she no longer wanted to live. The indictment charged Dr. Akula for improper GIP billing using the CPT code 99233 and 99236 for Patient YvDu. (ECF 1). Ms. McMillan's admitted expert report was critical of this GIP billing under CPT code 99233 based on Ms. McMillan's opinion that the documentation, but not the actual multiple diagnosis and pain medications that were required to keep Patient YvDu as being not justified for billing at GIP rate.

- Patient DoTu was eighty-seven years old when she came to the facility. She had "squamous cell carcinoma of the lungs," advanced kidney disease, hypertension, congestive heart failure, and dementia. The indictment charged Dr. Akula for improper home hospice services for DoTu. (ECF 1). However, Ms. McMillan's admitted expert report included criticism for GIP billing for Patient DoTu. The billing records showed DoTuwas billed under CPT code 99350 with a modifier "GV" that reflected nurse practitioner home care visits. These billing records were correct.

ROA.2759-2761. Merely focusing on codes and billing not only fails to show how each patient was treated but how Medicare was properly billed.

For example, in *United States v. Martinez*, 2008 WL 819024 (E.D. Wash. 2008)(not reported), the defendant was charged with executing a scheme to defraud the Medicare program by submitting claims for Level 5 payment. The government presented evidence to show that the documentation submitted by the defendant did not substantiate the request for Level 5 services. As part of its case, the government presented the testimony of a medical review claims analyst contracted to investigate potential fraud for Medicare. The expert claimed she reviewed chart notes for multiple office visits to determine the documentation supported Level 3 services. Similar to McMillan, the expert explained "the level of billing permitted is dependent upon the level of documentation provided." *Martinez*, p. 1. The court quoted the expert:

> "Well, documentation has to show that each of these items are-have been performed or documented. We review the record, and it's based on what documentation is in there. If a provider is billing 99215, we expect to see two of the three items on the list in the CPT book, which would be a comprehensive history, comprehensive exam and medical decision-making of high complexity. If we don't see that, we give the provider credit for seeing the patient if we have notes, but we may have to bump the code down a level or two levels.

*Martinez*, 2008 WL 819024, p. 2. The trial court disagreed. It found the evidence did, in fact, show the defendant provided Level 5 health care services. The defendant testified regarding her billing decisions. Dr. Martinez's testimony, along with that of her expert, presented testimony inconsistent with the existence of a scheme to defraud. *Martinez*, p. 6.

The court found the government did not present evidence concerning the services Dr. Martinez actually provided. *Id.* Rather, the government auditors downcoded based upon charting deficiencies "without completely understanding everything that the supporting documentation contained." *Martinez*, p. 6. And just as important to the case here, the court found the government's reliance upon the assumption that a service not charted was, in fact, not performed. "While this assumption is presumably useful to the health care benefit programs in making payments, it is neither a rule of law nor a rule of logic." *Martinez*, p. 6. In finding no scheme to fraud, the court concluded that "the fact that the Defendant's chart notes did not comply with

the expectations of three auditors does not prove the existence of a scheme to defraud beyond a reasonable basis." *Id.*

*Martinez* is quite instructive. The evidence here is similar and the core of the government's prosecution is somewhat similar. Those persons who provided testimony here related to the coding itself described incomplete charting and extremely mistaken coding. No witness provided evidence to show Dr. Akula instructed anyone to criminally mischart, fail to chart, or to code at the incorrect level. And the one person the government could have elicited testimony from to prove its case – Raj Biyyam – was not called as a witness. His absence was not adequately explained.

**B.    Dr. Akula's defense further exposes the lack of *mens rea* evidence to support a conviction for health care fraud.**

Dr. Akula testified on his own behalf. ROA.6482, *et seq.* At the outset Dr. Akula said he never admitted a patient into hospice that did not meet the criteria and never ordered anyone to admit a person into hospice treatment who did not meet the required criteria. ROA.6499.

Dr. Akula admitted Canon Hospice had coding errors or mistakes, especially when it transitioned from paper to Hospicesoft. ROA.6514. At that time, Sue May was responsible for the transition process. Several emails showed Sue May instructed employees on the proper codes and processes to follow regarding the patients. ROA.13046-13047. She even provided employees a clarifying message from Medicare: "PLEASE REMEMBER ... YOU cannot use Failure to Thrive as a Diagnosis for Hospice!!!" ROA.6675, ROA.13045. Other emails further affirmed Dr. Akula's testimony that Sue May was a long-term manager involved in billing. ROA.13056. These emails further contradicted May's testimony that she was not involved in billing. ROA.6237. Rather, these documents establish that Sue May supervised the billing department. ROA.6525.

Canon Hospice moved from paper to computerized bill in part from a 2014 Medicare audit. And while the audit revealed that Canon Hospice erroneously coded certain medical procedures, the main taint was, like now, incomplete, insufficient documentation. ROA.6528. The audit did not indicate

any error regarding the concerns the government claims are now criminal. The audit letter, direct to Sue May, says nothing about codes 99233, 99350, or 99236, or improper billing for health and physical. ROA.6527; ROA.8228-8232.

Dr. Akula testified that the billing changes to Canon Hospice were overseen by May (and Anderson), who also responded to the 2017 audit. ROA.6532. As a result of that audit, Dr. Akula terminated Raj and hired a certified coder. ROA.6533. The 2017 audit required Canon Hospice to repay overcharges. ROA.6536. Dr. Akula testified:

> You know, I'm not a coder. I'm not a biller, and I'm not an administrator. I'm still learning, you know, more information from this – all this discovery and documentation.
>
> I've heard bits and pieces and I still am not very clear as to what's billable and what's not. And I had consultants that believe that these are billable and somebody said it is not billable, so I'm confused. I don't do this, you know, I'm in infectious disease practice.

ROA.6545. Dr. Akula further answered the government's attorney that there were mistakes in billing. ROA.6546. And the claims that were submitted to Medicare by Canon Hospice – which apparently form the basis of the

government's indictment – were erroneous, as those related to the 2017 audit.
ROA.6546: "I said there were errors that were made and I am still trying to
understand.... how there was no documentation supporting these claims that
were made." "There were errors." ROA.6547.

Dr. Akula explained that May controlled the billing, that she trained Raj,
and when it became obvious that Raj was not the right person, May decided
to switch to a hospice software system at which point Raj was terminated.
ROA.6558. Dr. Akula's management focused on patients as a priority. He was
not concerned with personalities or the recommendation of nurses regarding
medical treatment: "I'm going to tell, one more time, if a licensed physician
says this patient needs to be admitted to Canon Hospice, that is my priority,
no nurse ..." ROA.6570.

Aligning with Dr. Akula's medical belief, Canon Hospice even took
patients prior to insurance certification:

> You know, that's where I would like to clarify. You know, that
> facility is meant for the people that have a certification from a
> referring doctor that has less than six months survival, in their

professional opinion. And if that patient comes in on a Friday and the insurance says, "No. We're not going to authorize." And I don't want the patient to die. I will take them. I know what they'll do. They'll authorize it Monday. They want to save on the weekend and that's exactly what used to happen. This is the game the insurance plays.

ROA.6573. Dr. Akula took a similar clinical approach in discharging patients. He was concerned that clinical persons decided whether a person was ready for discharge, the "dying patient in ... distress, pain, suffering." ROA.6575-6576. As such, Dr. Akula disagreed with the government's position that discharges would generate less money from Medicare: "That's your opinion." ROA.6575. Dr. Akula testified the health and safety of the patient controlled the clinical decisions regarding discharge, ROA.6578, noting the State of Louisiana once cited Canon Hospice for a premature discharge of patient who would return to an unsafe home. ROA.6578.

And in part because of the 2015 audit results, unfavorable not failed, Dr. Akula stated he had been after May, the administrator, to seek out an electronic medical records program. ROA.6581. Dr. Akula further relied on

May to supervise, administer, and fix all billing errors. Regarding a specific note as to general inpatient billing from Medicare from the 2015 audit, Dr. Akula responded:

> I have assigned a billing code supervisor and that is Sue May because she's the administrator. Whatever she brings to me is what I will do and the audit of 2015 was a lot of errors because of paper documentation. We made the switch to the electronic medical records.

ROA.6588. Dr. Akula ultimately testified May, who supervised Raj, was at fault for the incorrect billing. ROA.6594-6595.

Other than reveal a potpourri of mistakes and lack of supporting documentation, both of which the aforementioned evidence indicates, there is no evidence to show that Dr. Akula particularly broke any Medicare rule or weaved any scheme to defraud the Medicare system. To convict a person for violating 18 U.S.C. §1347, the government must establish that a person "acted with knowledge that his conduct was unlawful." *Bryan v. United States*, 524 U.S. 184, 191-92, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998), quoting *Ratzlaf v. United States*, 510 U.S. 135, 137, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994). *See*

*United States v. Ricard*, 922 F.3d 639, 648 (5th Cir. 2019)) ("Willfulness in the Medicare kickback statute means that the act was committed voluntarily and purposely with the specific intent to do something that law forbids; that is to say, with bad purpose either to disobey or disregard the law."); *United States v. St. John*, 625 Fed. App'x 661, 666 (5th Cir. 2015)(*per curiam*), *cert. denied*, 577 U.S. 1109, 136 S.Ct. 911, 193 L.Ed.2d 802 (2016)(accepting the district court's 18 U.S.C. § 1347 willfulness instruction, which stated that "willfully ... means that the act was committed voluntarily or purposely, with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law") (emphasis added).

Other than piling inference upon inference, there is no direct evidence to support the government's case. In contrast, see *United States v. Willett*, 751 F.3d 335 (5th Cir. 2014), the government presented testimony that defendant's wife, a co-conspirator, instructed employees to forge physician signatures and to use codes she had written on the reimbursement forms when documents to bill private insurance companies. 751 F.3d at 341. *United States v. Rao*, 123

F.4th 270 (5th Cir. 2024)(documents signed by defendant, some of which were signed by hand by Rao and others stamped with his signature, sufficient to prove defendant ordered unnecessary medical tests).

The government retained McMillan to provide expert billing testimony, not to provide a medical opinion. Although a registered nurse, McMillan was not competent to testify regarding the medical treatment of the individual patients used by the government in its indictment. *See e.g., United States v. Martinez*, 921 F.3d 452, 475 (5th Cir. 2019)(relevant patient file was part of review by government's medical expert witness, a doctor, who testified that the files were "very concerning" due to improper documentation, inappropriate methodologies, and results that were "not ... physiologically possible," which led him "to the conclusion that the test wasn't ever done."); *United States v. Ifediba*. 46 F.4th 1225 (11th Cir. 2022), *cert. denied*, 143 S.Ct. 2586, 216 L.Ed.2d 1194 (2023)(government's medical expert testified regarding inappropriate test defendant ordered for patients in order to submit reimbursement from Medicare); *United States v. Barnes*, 979 F.3d 283 (5th Cir.

2020), *cert. denied*, 142 S.Ct. 94 (2021)(government presented medical evidence of practitioner as to whether particular patient needed home health care services billable to Medicare). The aforementioned testimony also demonstrates that the government failed to prove the treatment was not medically necessary. Three witnesses called by the government, Dr. Blalock, Dr. Nath, and Dr. Fares, all testified regarding the necessary treatment rendered to each of the patients named in the indictment. None of these doctors' medical opinions were challenged as false.

Simply, the government failed to prove its case. *United States v. Sosa*, 777 F.3d 1279 (11th Cir. 2015), citing *United States v. Medina*, 485 F.3d 1291, 1297 (11th Cir.2007), *reh'g denied* (2007) (Under § 1347(a), the government must show the defendant knew the submitted claims were false. Claims are false if they are, inter alia, for treatment that was "not medically necessary," or for treatment that was "not delivered to the patients.").

Raj entered the Medicare billing codes for Canon Hospice, an act performed hundreds of times daily. The evidence also established that Raj

worked in isolation but under May's direction. Raj remained the absent witness whose absence remained unexplained.

Ultimately, the trial court erred by failing to grant a judgment of acquittal or a new trial. The judgment of acquittal preserves the right to argue insufficiency of evidence. *United States v. Allison*, 616 F.2d 779 (5th Cir. 1980), *cert. denied*, 449 U.S. 857, 101 S.Ct. 156, 66 L.Ed.2d 72. And in this case, the insufficiency of evidence is quite evident. This court should reverse the conviction for lack of evidence.

**3.    The upward variance results in an unconstitutionally excessive sentence.**

After the district court granted some of Dr. Akula's sentence objections, the court calculated a Guidelines range of 151-188 months. ROA.7066. To that sentence range, rather than consider a downward departure as requested, the court imposed an upward variance. The resulting sentence of 240 months is not substantively reasonable but unconstitutionally excessive.[6]

---

[6] While the record does not show Dr. Akula formerly objected to the ultimate sentence, this court can review the issue for plain error. *Puckett v. United States*, 556 U.S. 129, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009).

### *Standard of Review*

A criminal sentence is reviewed for reasonableness. *Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). First, the court determines whether the district court's sentence was procedurally reasonable. *Id.* at 51. If the sentencing decision is procedurally sound, the court then considers its substantive reasonableness, reviewing for abuse of discretion. *Id.*, *United States v. Bostic*, 970 F.3d 607, 610 (5th Cir. 2020).

When examining an upward variance from the guidelines range, the court considers whether the sentence "(1) does not account for a factor that should have received significant weight, (2) gives significant weight to an irrelevant or improper factor, or (3) represents a clear error of judgment in balancing the sentencing factors." *United States v. Smith*, 440 F.3d 704, 708 (5th Cir. 2006).

### *Argument and Discussion*

After a guideline adjustment, the court noted Dr. Akiva faced a guideline sentence between 151 - 188 months. ROA.7066. Rather than impose

a sentence within that range, the court opted to impose an upward variance, while simultaneously denying Dr. Akula's motion for a downward variance. ROA.7066, ROA.7070.

As grounds for the higher sentence, ultimately 52 months more than the guideline high end, ROA.7089, the court noted Dr. Akula's pre-trial behavior, the amount of supposed loss, and the defendant's failure to accept responsibility. ROA.7085-7092.

The grounds for upward variance are inopposite to Dr. Akula's ground for downward departure. ROA.13346, *et seq.* (sealed). Dr. Akula filed a motion moving for a downward variance on physical impairment grounds. He explained in detail his poor medical condition and the general punitive aspect of incarceration for an older defendant. Dr. Akula also provided numerous exhibits and character letters. ROA.13353, *et seq*.

The upward variance is unconstitutionally excessive under the Eighth Amendment. There is no particularly aggravating circumstance to support the variance. *See United States v. Rivera-Berrios*, 968 F.3d 130 (1st Cir. 2020)(nature

of firearm alone insufficient to support variance since guideline calculus already accounted for offense). There is no significant factor to distinguish this case from similar cases. ROA.13355 (examples of similar fraud convictions). And there is no reason to penalize Dr. Akula for maintaining his innocence, particularly in light of the court's denying the qualification of an expert to counter the government's case and lack of evidence to support a conviction. In sum, the court assessed an upward variance not supported by either the facts or the intended consequences of the guidelines. This court should vacate and remand for the district court to resentence without applying an upward variance.

## CONCLUSION & RELIEF SOUGHT

The district court erred by not qualifying Dr. Davis as an expert in medical coding. His background and actual experience in coding medical procedures far outweighs the lack of a certificate that merely serves as a wall ornament. The district court's rule denied Dr. Akula his Sixth Amendment right to present a defense. It also allowed the testimony of the government's

expert to serve as the only specific explanation to the jury about Canon Hospice's Medicare billing. This error requires vacatur and a new trial.

Nonetheless, the entirety of the evidence fails to show how Dr. Akula committed health care fraud. While there is ample evidence of errors, there is insufficient evidence to show Dr. Akula purposely billed Medicare in order to enrich himself. Rather, the government's case proved that Rayeshwar Biyyam (Raj) as the person responsible for Canon Hospice's Medicare billing. Since the government did not present Raj's testimony it cannot show that Dr. Akula fraudulently ordered billing. The court should reverse the conviction.

Finally, this court should vacate the sentence as unconstitutionally excessive. There are several factors – especially Dr. Akula's age and medical condition – that warrant a sentence without a variance.

Respectfully submitted:

/s/ Mark David Plaisance

**MARK DAVID PLAISANCE**
**PLAISANCE LAW, LLC**
P.O. Box 1123
Prairieville, LA 70769
(225) 775-5297

-69-

mark@plaisancelaw.com
CJA Appellate Attorney

## CERTIFICATE OF SERVICE

I certify that I have provided this 1st day of July 2025, by electronic filing, a copy of this brief to counsel for the United States of America, and by United States Mail, postage prepaid, to:

Dr. Shiva Akula (#61778-509)
FCI Memphis
Federal Correctional Institution
P.O. Box 34550
Memphis, TN 38184

/s/ Mark David Plaisance
**MARK DAVID PLAISANCE**

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.    This document does not exceed the word limit of Federal Rule of Appellate Procedure, Rule 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure, Rule 32(f), this document contains 12,984 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure, Rule 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure, Rule32(a)(6) because this document has been prepared in a proportionally spaced typeface using WordPerfect Version X9 in 14-point Palatino Linotype.

/s/ Mark David Plaisance
**MARK DAVID PLAISANCE**
July 1, 2025